## REDMAN v. BALTIMORE & CAROLINA LINE, Inc.

No. 268.

Circuit Court of Appeals, Second Circuit.
April 30, 1934.

MANTON, Circuit Judge, dissenting.

Hunt, Hill & Betts, of New York City (Geo. Whitefield Betts, Jr., H. Victor Crawford, and William R. Meagher, all of New York City, of counsel), for appellant.

Frederick R. Graves, of New York City, for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge. ·

The errors assigned by the defendant challenge the denial of its motions to dismiss the complaint for insufficient proof and to direct a verdict for the defendant. Hence the question presented on this appeal is whether there was any evidence to support the verdict.

The plaintiff was a colored seaman, 38 years of age at the time of the occurrence complained of. On February 21, 1930, he was taken to a hospital with gangrene of the left foot, which ultimately necessitated the amputation of the lower one-third of his leg. The theory of his suit is that the gangrene resulted from an injury sustained on February 13, 1930, by reason of the defendant's negligence in allowing the deck of its vessel, on which he was employed as a cook, to be dark and littered with broken boxes. On that date the vessel was lying at a dock in Brooklyn. Redman testified that, while proceeding from his quarters to his work in the galley at 5 o'clock in the morning, he found the deck light out, and in the dark he stumbled over a broken box slat having a nail in it which punctured the side of his foot just above his low shoe, producing a bleeding scratch about an inch and a half long. He washed the foot with hot water and continued at work without discomfort. The next day, however, his foot was swollen and pained him. He says he told the chief steward of it, which the latter denies. In the evening he went ashore, got some liniment at a drug store, and spent the night ashore. The following day, February 15th, his ship was to sail shortly after noon. He got to the dock after she had gone. He returned to a rooming house and nursed his foot with applications of liniment and hot water until the morning of the 21st, when his condition was so serious that an ambulance was called which took him to the hospital, where an operation of periarterial sympathectomy was performed on February 24th, followed several weeks later by the amputation. The theory of the case is that the scratch became infected and the infection produced gangrene because of the diseased condition of the plaintiff's arteries.

Redman's story that he punctured his foot with a nail while walking along the deck in the dark is wholly unsupported; no witness testified to seeing the wound or to hearing Redman complain of it. No witness could contradict the story because he was alone when he says it happened. But Redman's own conduct contradicts it most completely. Dr. Perez, who took down his history when he was admitted to the hospital, says that he made no mention of a cut or scratch, but told of a sudden onset of pain a few days before and of applications of water so hot as to produce blisters. Dr. Wikle, who performed the first operation, talked with the plaintiff about his case, and to him not a word was said of any scratch. Nor did Redman speak of it to two other doctors who saw him at the hospital, Dr. Charache and Dr. Shatara, though they could not say that they had ever asked him specifically about the history of his case. It is incredible that Redman would not have mentioned the nail scratch to the hospital doctors, if his story were true. Had the scratch given him no trouble, he might not think of its connection with what followed, and so might remain silent about it. But his story is that it bothered him almost at once and grew continuously worse. He says his scratched foot began to pain him on the 14th so much that he went ashore to get some sort of dressing for it; that it was so painful he decided to stay on shore and was kept awake with the pain most of the night, and so overslept and lost his ship; that his foot continually got worse right up to February 21st. Under such circumstances no man could have failed to think of the connection between the injury and the condition he was in when his history was taken at the hospital. He says by way of explanation that he was out of his head when admitted, which nobody confirms.

ᴄ

After prodding by questions, he testified he did mention the scratch to Dr. Perez, which the latter denies.

On the afternoon of February 14, the day following the alleged accident, Redman signed articles for the next voyage and was passed as fit by the medical examiner for the defendant company. Although he had noticed that his foot was swollen and somewhat painful, he said nothing about it to the medical examiner, and his attempted explanation of his silence is not convincing. In March, 1931, he called at the office of the defendant's claim agent and signed and swore to two written statements, which the agent dictated to a stenographer as Redman told his story. These statements give a very different account from that to which Redman now testifies, and make no mention whatever of any injury by a nail. He denies, contradicting the agent's testimony, that he read the statements before signing them, and we must accept it that he did not. But the statements do not read like fabrications. They make complaint that he got his feet wet working in the rain, that his quarters were very cold because the steam had been ordered shut off, and on February 12th his left foot began to pain him. It is highly unlikely that the adjuster should have substituted this ground of complaint for that of the nail scratch, which Redman says was the one he then made. While not conclusive against him, these statements, added to the testimony of the impartial hospital doctors, strongly corroborate their theory that Redman's gangrene resulted not from a wound, but from syphilitic endo-arteritis, being precipitated perhaps by exposure to cold or to extreme heat (applications of hot water). On the whole record the inference is irresistible that the story of the nail did not come into the plaintiff's mind until he prepared to bring the present suit. Moreover, the hospital doctors are all in agreement that the type of "dry" gangrene with which the plaintiff was afflicted could not have resulted from an infected wound unless the wound had caused a stoppage in the arteries by reason of infection, and the medical testimony that there was no infection is undisputed. Had the plaintiff suffered from "wet" gangrene, the operation of periarterial sympathectomy would never have been performed, and the amputation of his foot could not have been postponed, as it was, until April 17th. It was proved beyond doubt that no infected wound was discovered upon the plaintiff's foot when he came to the hospital; yet all say it would have been seen had there been a scratch which had become infected. Dr. Neustaedter, who first saw the

plaintiff shortly before the trial, gave his opinion, in response to a hypothetical question, that an injury by a nail puncture such as the plaintiff had described was a competent producing cause of the gangrene which existed; but the question failed to take into account that the gangrene was of the dry type, and his opinion is not entitled to override the testimony of the doctors who actually treated the plaintiff. Obviously the verdict for $5,000 was the result of a very natural sympathy for a man who had suffered so serious a disability.

We have examined the entire record with care and are convinced that the evidence is insufficient to support the verdict. The uncorroborated story of the plaintiff is so thoroughly contradicted by his own conduct as well as by the unimpeached testimony of disinterested witnesses that no impartial jury could have found a verdict in his favor. His testimony that a nail produced a bleeding scratch an inch and a half long is disproved by the physical fact that no such scratch was visible when he reached the hospital. When the only testimony for a plaintiff is contrary to physical facts proven without contradiction, a verdict for the plaintiff should be set aside. See Union Indemnity Co. v. Leidesdorf, 37 F.(2d) 26 (C. C. A. 2); Baltimore & O. R. Co. v. O'Neill, 186 F. 13, 15 (C. C. A. 6); Falkenstern v. Greenfield, 145 Wis. 232, 130 N. W. 61. Indeed the court charged the jury that "the testimony of the medical witnesses is undisputed that there was no evidence of a wound on Redman's foot and if you believe the testimony of plaintiff's witness Dr. Wikle and defendant's witnesses that a wound 1½ inches long received on February 13, 1930, producing an infection sufficient to cause gangrene would be visible on examinations made in the Cumberland Hospital on February 22, 1930, and thereafter, then you must find for the defendant."

We think that the jury were constrained to believe such testimony for there was no substantial evidence that an infected scratch would not have been visible. Dr. Neustaedter's opinion that the blisters might have concealed it was mere speculation. The doctors who actually saw Redman were sure there was no such scratch. It has repeatedly been held by the highest authority that before evidence may be left to the jury there is a preliminary question for the trial judge, which is not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed. See Pleasants v. Faut, 22

Wall. 116, 120, 22 L. Ed. 780; Penn. R. R. Co. v. Chamberlain, 288 U. S. 333, 343, 53 S. Ct. 391, 77 L. Ed. 819. Within this principle we think the defendant's motion for a directed verdict should have been granted. Accordingly the judgment must be reversed, and the cause remanded for a new trial. We have no power to direct a dismissal without prejudice, as the appellant urges. Slocum v. N. Y. Life Ins. Co., 228 U. S. 364, 33 S. Ct. 523, 57 L. Ed. 879, Ann. Cas. 1914D, 1029.

Judgment reversed.

MANTON, Circuit Judge (dissenting).

Because the decision about to be rendered by the majority destroys a jury's determination, which should prevail here, I dissent.

The credibility of witnesses, the weight and probative value of all the evidence, are to be determined by the jury and not by the judge. Southwestern Brewery v. Schmidt, 226 U. S. 169, 33 S. Ct. 68, 57 L. Ed. 170; Baltimore & Ohio R. R. Co. v. Groeger, 266 U. S. 521, 524, 45 S. Ct. 169, 69 L. Ed. 419. It is not within the province of the court to pass upon the credibility of the witnesses; that is the jury's function. A judge may determine whether upon all the evidence a jury could reasonably have found for the plaintiff, and, if the jury could not, the verdict may be set aside. But we may not set aside a verdict simply because we disagree with the finding.

The appellee is uncontradicted in so far as he relates how he scratched his foot on a nail projecting from a slat from a broken box when going to his duties on a dark night. The steward denied having been told about the scratch but his unreliability was clearly shown by his connection with what appeared to have been an offer to sell his testimony to the highest bidder. Appellee's explanation of his failure to consult with a physician, who was on board primarily to discover venereal disease, is not conclusive but goes merely to his credibility. And it was for the jury to weigh the testimony of the claim adjuster keeping in mind his interest and contradictory statements.

Dr. Perez' denial of having been told about the scratch and the apparent resentment shown by him at the slightest intimation of lack of professional ability, his resulting hostility, the fact that he did not make out his report or history of the appellee's case the day he made the examination, together with his ability or inability to understand English, were all circumstances to be weighed by the jury; particularly the probability of misunderstanding the appellee. Nor was it an outstanding or determining circumstance that the appellee failed to inform the other doctors of the scratch in view of what a layman of his mentality might have thought if a doctor had been told of a scratch and appeared to consider it unimportant.

The medical testimony that an external injury would not be a competent producing cause of dry gangrene was in conflict. Although the doctors testified that there was no infection, it must be observed that they had not seen the foot until after gangrene had set in and what observations they did make were probably influenced by preconceived ideas gathered from Dr. Perez' prior report. In any case, the weight of this expert testimony was for the jury. McGowan v. American Tan Bark Co., 121 U. S. 575, 7 S. Ct. 1315, 30 L. Ed. 1027. In my opinion we cannot say that the jury were unreasonable in giving credit to Redman's testimony that there was infection and to the testimony of others that an infected scratch could have brought on the gangrene.

In Union Indemnity Co. v. Leidesdorf, 37 F. (2d) 26, we held that the evidence did not warrant the case going to the jury where the facts could not possibly support the plaintiff's theory. To be sure, in every case before the question of fact is left to the jury, there is for consideration of the trial judge the preliminary question of whether there is literally no evidence or whether there is any evidence upon which the jury could properly proceed to find a verdict. That is not the instant case.

In Pennsylvania R. R. Co. v. Chamberlain, 288 U. S. 333, 53 S. Ct. 391, 77 L. Ed. 819, the court held that the trial judge may not submit to the jury issues of fact where uncontradicted and unimpeached witnesses show affirmatively that the facts sought to be inferred did not exist. But here we have a question of credibility only, which is peculiarly for a jury. No inference has to be drawn that there was an infection, for there is positive testimony to that effect. The appellee testified that he noticed his foot swollen and discolored where the nail went in, and where it was cut there was a red and swollen spot and "later it went to his toes." In this situation, the trial judge could have done nothing other than submit the question to the jury. Ætna Life Ins. Co. v. Ward, 140 U. S. 76, 11 S. Ct. 720, 35 L. Ed. 371.

Nor does this case come within the rule announced in Penna. R. R. Co. v. Chamberlain, supra, that, where proven facts give

equal support to each of two inconsistent inferences, in which event, neither of them being established, judgment as a matter of law must go against the party on whom rests the necessity of sustaining one of these inferences as against the other before he is entitled to recover. The fact here is that the appellee's case rests upon sufficient support in the testimony that he had an infection resulting from a competent producing cause, which in turn resulted in gangrene setting in and the ultimate amputation of his leg. The judgment should be affirmed.